**Frank A. WHITESIDES, Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF PUBLIC SAFETY, DIVISION OF MOTOR VEHICLES, Appellee.**

**No. S–8431.**

Supreme Court of Alaska.

April 13, 2001.

Michael J. Zelensky, Ketchikan, for Appellant.

Marilyn J. Kamm, Assistant Attorney General, Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Chief Justice.

The question presented is whether licensed drivers are entitled to in-person hearings before a hearing officer concerning the revocation of their licenses, or whether telephone hearings satisfy due process. We hold that where drivers' credibility is material in-person hearings are required. The right to drive is important, in-person communications are more effective in transmitting a sense of whether a party is telling the truth, and added costs do not outweigh the value of in-person hearings.

### Facts

At approximately 11:00 p.m. on January 28, 1996, Ketchikan Police Officer Brian Kertz was alerted to a possible car fire in downtown Ketchikan. Upon investigation, Kertz saw a "large amount of smoke billowing from the engine" of the pickup truck in which Frank Whitesides and his friend were sitting. Whitesides was sitting in the driver's seat, and the keys were in the ignition. Whitesides and his friend ignored Kertz's command to exit the vehicle. Kertz used his fire extinguisher to put out flames coming from beneath the vehicle and pulled the two out of the truck.

According to Kertz, Whitesides exuded a "very strong odor of intoxicants" and his eyes were "bloodshot, and watery." Based on his observations, Kertz administered field sobriety tests to Whitesides; based on Whitesides's performance during these tests, Kertz placed him under arrest for driving while intoxicated (DWI).[1]

Kertz took Whitesides to the police station, where he began "processing" Whitesides for DWI. Kertz read Whitesides the "implied consent warning," in which Kertz informed Whitesides that he was being asked to submit to a chemical test of his breath. Kertz explained the operation of the Intoximeter 3000 (the apparatus that would measure the amount of alcohol in Whitesides's breath) as well as the possible consequences of refusing to take the breath test. He also offered Whitesides access to a telephone and telephone directory so that he could call an attorney.

Eventually, Kertz prepared the Intoximeter to receive a sample of breath and asked Whitesides, "Did you want to submit a sample of breath?" Whitesides responded by protesting that he "wasn't driving anywhere." At that point, Kertz repeated his recitation of the potential consequences for refusing to submit to a chemical test. Kertz asked Whitesides to submit to the test several more times; Whitesides's responses to these requests were ambiguous and poorly focused. For example, on one occasion, Whitesides agreed to take the test but then protested that he had not been driving. On another occasion, Whitesides asked to review information that Kertz had already read to him.

Kertz eventually concluded that Whitesides had refused to take the test and notified him that, if he changed his mind before Kertz finished with the rest of the process, he would be allowed to submit a sample.

Disregarding Whitesides's protestations that he had not refused to take the test, Kertz asked Whitesides whether he wanted to sign a form saying that he refused. Whitesides asked if he needed a lawyer to read the form before he signed it. After some discussion with Kertz, Whitesides decided not to call an attorney.

Kertz then allowed Whitesides to read a document detailing the refusal offense and its attendant consequences while Kertz prepared the Intoximeter for a second time.

---

1. AS 28.35.030(a) defines operating a vehicle while intoxicated as follows:

    A person commits the crime of driving while intoxicated if the person operates or drives a motor vehicle or operates an aircraft or a watercraft

    (1) while under the influence of intoxicating liquor, or any controlled substance;

    (2) when, as determined by a chemical test taken within four hours after the alleged offense was committed, there is 0.10 percent or more by weight of alcohol in the person's blood or 100 milligrams or more of alcohol per 100 milliliters of blood, or when there is 0.10 grams or more of alcohol per 210 liters of the person's breath; or

    (3) while the person is under the combined influence of intoxicating liquor and a controlled substance.

Kertz then told Whitesides that "[i]f you refuse this time, this is the second time that I've run the machine, you are going to be charged." Whitesides responded by asking Kertz to "[w]ait a minute," and repeated that he wasn't driving. Kertz then told Whitesides that "[t]his is your last opportunity. You've got to give me yes or no. Do you want to submit a sample of breath on the Intoximeter?" Whitesides, however, did not reply with a "yes" or "no"; rather, he asked Kertz whether he would be arrested for DWI if he submitted to the test.

Kertz then read Whitesides a "notice and order of revocation" for his refusal to submit to the breath test. Following Whitesides's question as to the consequences of taking and passing the test,[2] his comment about the difficulty of the situation he faced, his refusal to sign a form indicating his refusal to take the test, and various other comments by Whitesides, Kertz asked one last time, "Do you want to submit a sample of breath in the Intoximeter 3000?" When Whitesides gave an indiscernible answer, the officer declared the process over and turned off the video recorder. Kertz then issued Whitesides a "notice and order of revocation" advising him that his driver's license would be revoked for refusing to submit to testing.

At the administrative hearing several months later, Whitesides testified that he had agreed to take the test about "ten seconds" after Kertz turned off the video recorder. Kertz testified that he could not remember whether Whitesides had made this offer. Kertz was also asked if he would have permitted Whitesides to take the test if Whitesides had agreed to take it just after Kertz turned off the video recorder. He indicated uncertainty because "I guess I've never had it actually happen that I can remember before, in my career."

*Proceedings*

Whitesides sought administrative review of the "notice and order of revocation" of his driver's license on grounds that included his claim that he did not refuse to take a breath test. Whitesides requested that the hearing be conducted in person. On March 1, 1996, the Department of Public Safety gave Whitesides notice of an administrative hearing scheduled "at the discretion of D.M.V."

Whitesides was also charged with the criminal offenses of DWI and Refusal. A criminal trial commenced but ended in a mistrial. The criminal charges were later dismissed by the district attorney's office.

The Division of Motor Vehicles (DMV) never scheduled an in-person hearing. Meanwhile, effective July 4, 1996, the legislature amended AS 28.15.166(e) to require that revocation hearings "be held by telephone unless the hearing officer finds that a telephonic hearing would substantially prejudice the rights of the person involved in the hearing or that an in-person hearing is necessary to decide the issues to be presented in the hearing."[3] Consequently, the Department of Public Safety scheduled a telephone hearing for October 2, 1996. Whitesides objected to the telephone hearing, arguing that "[t]he failure to allow a hearing in-person would substantially prejudice [his] rights ... in that he is a witness ... along with, if necessary, the arresting officer and potentially another witness...." Whitesides also objected to the extensive delay in scheduling his hearing.

The hearing officer overruled Whitesides's objections, and the DMV proceeded with its revocation action against Whitesides's license. The hearing officer heard Whitesides's challenge to the revocation in a series of three telephone hearings involving Whitesides, his attorney, and the hearing officer, beginning on October 2, 1996—some eight months after the arrest. After hearing argument from Whitesides's attorney and testimony from Whitesides, Kertz, and the dis-

---

**2.** The Ketchikan Police Department's unofficial transcript contains an erroneous version of this exchange. We have characterized Whitesides's comment based on our review of the tape.

**3.** *See* 1st Sp. Sess. Ch. 6, § 8 SLA 1996. Former AS 28.15.166(e) provided for an in-person hear-

ing held "at the office of the department nearest to the residence of the person requesting the hearing." Current law provides for the same locations for in-person hearings when they are found to be required.

trict attorney who dismissed the criminal charges, the hearing officer found that Whitesides refused to submit to a breath test. Whitesides's license was ordered revoked for a period of one year from the date of the hearing officer's decision.

Whitesides appealed this decision to the superior court, which upheld the hearing officer's determination. On appeal to this court, Whitesides argues (1) that the DMV violated his right to due process by denying an in-person hearing; (2) that the DMV's delay in holding the license revocation hearing violated Whitesides's right to due process; (3) that the "lack of regulations" governing administrative license revocation hearings violated Whitesides's due process rights; (4) that the hearing officer's findings that Whitesides refused the breath test were unsupported by the evidence; and (5) that the hearing officer erred in finding that there were reasonable grounds to believe that Whitesides was guilty of DWI when he was arrested.

■ We decide that only the first issue has merit and summarily determine the other issues adversely to Whitesides.[4]

### The DMV's Denial of an In-person Hearing Constituted a Due Process Violation.

■ Arguing that credibility was crucial to the central issue in this case, whether he agreed to take the breath test, Whitesides contends that his license revocation should be "reversed for failure to grant an in-person hearing." Without a chance to observe Whitesides's demeanor, he states, the hearing officer could not "fairly and meaningfully" assess his credibility. He contends that since his credibility was at issue in the hearing, the due process clause of the Alaska Constitution[5] affords him the right to present his testimony in person to the trier of fact. The standard of review applicable to this issue is de novo.[6]

---

**4.** Concerning his delay claim, Whitesides likens this case to *United States v. $8,850 in United States Currency*, 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983), in which the United States Supreme Court held that delay in initiating a civil forfeiture case may violate due process and suggested a test similar to that used to determine whether an accused's right to a speedy trial in a criminal case is violated. *Id.* at 564, 103 S.Ct. 2005. But this case is different from civil forfeiture cases because Whitesides was not deprived of his right to drive pending the hearing, whereas in civil forfeiture cases the property to be forfeited has typically been removed from the possession and use of the respondent pending the hearing. *Id.* Further, although Whitesides claims that the eight-month delay resulted in Officer Kertz's lack of memory concerning what was said after the video recorder was shut off, this claim is not supported by the record. At Whitesides's criminal trial in June 1996, within speedy trial limits, Kertz was already unable either to verify or to directly contradict Whitesides's account of events after the video camera was turned off.

Whitesides's lack of regulations argument is fully addressed by the decision of the superior court. Procedures for carrying out administrative review of license revocations are set forth in AS 28.15.166. These procedures, as supplemented by pertinent case law, afford a licensee due process. Whitesides claims that the hearing officer's determination that he had refused to take the breath test is unsupported by substantial evidence; such a claim juxtaposes his refusals while the video camera was running with the alleged cure of these refusals just after the video camera was turned off. The video tape itself is substan-

tial evidence that Whitesides refused to take the test. Likewise, the video tape supports an inference that it is unlikely that Whitesides cured his prior refusals, given the behavior shown by the tape. As the hearing officer stated:

> Mr. Whitesides is asking me to take a leap of faith. I have to believe that two people transformed their demeanor as soon as the videotape was turned off. In that instance, Mr. Whitesides changes his negative attitude to a positive one and Officer Kertz changed from trying to get a breath sample to trying to prevent one. I don't believe this happened.

Further, Kertz's statement that he did not remember anyone ever recanting also supports the conclusion that a recantation did not take place in Whitesides's case.

As to the argument that there were not reasonable grounds to believe that Whitesides had been guilty of DWI, Whitesides argues that the vehicle in which he was sitting was inoperable because it had caught fire while he was sitting in it. But the evidence is uncontradicted that the vehicle was operable when Whitesides turned it on, and Officer Kertz's observations of Whitesides's condition reasonably suggested that Whitesides was intoxicated.

**5.** Article I, section 7, of the Alaska Constitution provides, in part, that "[n]o person shall be deprived of life, liberty, or property, without due process of law."

**6.** *See Barcott v. State, Dep't of Pub. Safety*, 741 P.2d 226, 228 (Alaska 1987) (court will adopt the rule most persuasive in light of precedent, reason, and policy).

We apply the framework of *Mathews v. Eldridge*[7] when evaluating whether administrative proceedings satisfy due process.[8] We consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[9]

We proceed to review these considerations in the context of this case.

### 1. A driver's license is an important property interest.

Whitesides's interest is in retaining his right to drive. Both federal and state courts have recognized that a driver's license is an important property interest. In *Bell v. Burson*, the United States Supreme Court explained that, "[o]nce licenses are issued ... their continued possession may become essential in the pursuit of a livelihood."[10] Issued licenses are "important interests of the licensees, ... [which] are not to be taken away without that procedural due process required by the Fourteenth Amendment."[11]

In *Berlinghieri v. Department of Motor Vehicles*, the California Supreme Court explained at length the practical importance of a driver's license:

> In our present travel-oriented society, the retention of a driver's license is an important right to every person who has obtained such a license.... [T]he reality of contemporary society is that public transportation systems may not meet the needs of many travellers [sic] and other forms of transportation, such as taxicabs, are not economically feasible for a large portion of the population.
>
> Whether a driver's license is required only for delivering bread, commuting to work, transporting children or the elderly, meeting medical appointments, attending social or political functions, or any combination of these or other purposes, the revocation or suspension of that license, even for a six-month period, can and often does constitute a severe personal and economic hardship.
>
> For plaintiff, as a route driver, her ability to drive a delivery truck affects her very livelihood and the suspension of her license obviously will affect her directly, immediately, and adversely. Further, as a single working parent, she is faced with the numerous responsibilities of child rearing, many of which necessitate a speedy and reliable means of transportation. The suspension of plaintiff's license, even for only six months, may have profound and obvious effects on her "life situation" and thus, ... constitutes "quasi-judicial" administrative decisions that have an impact on the individual "sufficiently vital ... to compel full and independent review" by the court.[12]

This court has likewise recognized that "[a] driver's license is an important property interest."[13] Calling driver's license revocation hearings quasi-criminal, we have held that the right to test the reliability of a breath test applies in civil driver's license revocation proceedings as well as in criminal prosecu-

---

7. 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

8. *See Noden v. Commercial Fisheries Entry Comm'n*, 680 P.2d 493, 499 (Alaska 1984).

9. *Mathews*, 424 U.S. at 335, 96 S.Ct. 893, 47 L.Ed.2d 18.

10. 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).

11. *Id.*

12. 33 Cal.3d 392, 188 Cal.Rptr. 891, 657 P.2d 383, 387–88 (1983) (citations omitted); *see also* *Shavers v. Kelley*, 402 Mich. 554, 267 N.W.2d 72, 87 (1978), *cert. denied*, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979) ("In Michigan the independent mobility provided by an automobile is a crucial, practical necessity; it is undeniable that whether or not a person can obtain a driver's license or register and operate his motor vehicle profoundly affects important aspects of his day-to-day life.").

13. *Champion v. Department of Pub. Safety*, 721 P.2d 131, 133 (Alaska 1986).

tions for DWI.[14] And we have applied a prophylactic rule to exclude from a license revocation proceeding the results of a Breathalyzer test secured in violation of the defendant's right to counsel.[15] These cases underscore the importance of the right to drive.

   2.  *In-person testimony is a valuable tool for evaluating the credibility of witnesses.*

Here we deal with the second of the *Mathews* factors. In terms applicable to this case, do telephone hearings create an unacceptable risk of an erroneous deprivation of a person's right to drive? This turns in large part on the value of the live testimony of a party.

The significance of live testimony and demeanor evidence has been long recognized. Blackstone explained that, "[by] examination of witnesses *viva voce,* in the presence of all mankind, ... and this [method] only, the persons who are to decide upon the evidence have an opportunity of observing the quality, age, education, understanding, behaviour, and inclinations of the witness." [16] This method "was also indeed familiar among the *antient* Romans ... [a]nd this, or somewhat like it, was continued as low as the time of Hadrian." [17]

Courts have emphasized the advantages inherent in a traditional hearing in which witnesses testify in the presence of the trier of fact. For example, in *Mattox v. United States,* the United States Supreme Court noted that personal examination and cross-examination of the witness provides the accused with

   an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.[18]

In this state, we have also recognized the uniqueness of the trial court's position to judge credibility. In *Alaska Foods, Inc. v. American Manufacturer's Mutual Insurance Co.,* we held that

   when there has been oral testimony, and the trial judge has observed the witnesses in person, we must pay some deference to his judgment as to credibility to the extent that his findings are based on such oral testimony ... because ... we cannot have the advantage that the trial judge has had of basing a judgment as to credibility on the demeanor of the witnesses that appear before him.[19]

Other states have long traditions acknowledging the special abilities of the fact finder. In *Durant v. Rogers,* the Illinois Supreme Court held:

   "It is a rule, that the jury shall be the sole judges of the credibility of a witness. They see them on the stand, mark their demeanor, perceive many small matters which escape less observant eyes, and are in the best position to judge of credibility, and they have an undoubted right to find in favor of the testimony of one when weighed against that of the other." [20]

■  The unique ability of the hearing officer or trial court to evaluate credibility has, for example, a strong influence on the standard of review. According to *Evans v. Evans,* this court reviews findings of fact for substantial evidence because the trier of fact is "in the best position to evaluate the witnesses' credibility and their testimony." [21] Deference to those who actually observe witnesses is codified at Alaska Civil Rule 52(a): "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." This court consistently grants deference to trial courts where credibility is at issue, as for example in *Kohl v. Legoullon,* where we not-

---

**14.**  *See id.* at 132–33.

**15.**  *See Whisenhunt v. State, Dep't of Pub. Safety,* 746 P.2d 1298, 1299 (Alaska 1987).

**16.**  3 William Blackstone, *Commentaries* *373.

**17.**  *Id.* *374.

**18.**  156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895).

**19.**  482 P.2d 842, 845 (Alaska 1971).

**20.**  87 Ill. 508, *3 (Ill.1877).

**21.**  869 P.2d 478, 481 (Alaska 1994).

ed that "[t]he trial court is in the best position to assess the credibility of witnesses." [22] Similarly, in *Crook v. Mortenson–Neal*, we recognized that "the superior court was in the best position to evaluate the defendants' demeanor and credibility. We, therefore, defer to the court's view as expressed in the quoted finding." [23]

This case law indicates that in-court testimony has persuasive characteristics absent from testimony given out of the presence of the trier of fact.[24] Where the witness's truthfulness is disputed, demeanor can be important.[25] In such cases, denying an in-person hearing denies a party an opportunity to present evidence in the most effective way possible.

We do not wish to overstate the benefits of communicating in person, nor the drawbacks of telephone communication. We live in an era when efficiency often dictates that many communications be machine-facilitated. When the technology employed is operating well, such communications are at least good enough to transmit basic information. But the potential for empathy and nuanced understanding is much greater in person-to-person communications than in any of the various forms of telecommunicating. Likewise, when a party is denied an in-person hearing before a trier of fact, there is a risk that the party will be less able to convey the message that his story is the truth.

We recognize that legal authority supports the use of telephone hearings and testimony in many circumstances. For example, Alaska Civil Rule 99 allows one or more parties, counsel, witnesses, or even the judge "to participate telephonically in any hearing or deposition for good cause and in the absence of substantial prejudice to opposing parties." [26] In *Matter Involving Triem*, we rejected the contention that a committee chairperson's telephone participation in a bar disciplinary hearing violated the defendant's due process rights, adding that "[t]he routine nature of such appearances belies [the litigant's] due process concerns." [27] Most recently, in *Silvers v. Silvers*, we found an abuse of discretion where the trial court refused to allow the defendant to testify by telephone in a civil trial.[28]

These authorities show that the convenience afforded by telephone participation is not generally outweighed by the values associated with in-person participation. But, except for *Triem*, which is distinguishable on other grounds,[29] they do not hold that a party who desires to present testimony in person to the trier of fact does not have that right.

3. *The government's interest in cost saving and public safety will not be greatly prejudiced by granting in-person hearings where credibility is at issue.*

The *Mathews v. Eldridge* construct next requires that we consider the nature of the

**22.** 936 P.2d 514, 518 n. 5 (Alaska 1997)

**23.** 727 P.2d 297, 306 (Alaska 1986).

**24.** *See, e.g., Monsma v. Williams*, 385 P.2d 107, 111 (Alaska 1963) ("In a case, heavy with demeanor evidence as this was, it was the task of the trial court, not ours, to resolve the apparent conflict between the evidence of the plaintiff and that of the defendant."); *Awes v. Walker*, 370 P.2d 187, 190 (Alaska 1962) ("In reviewing the findings of the trial court, we do not have before us evidence of Walker's demeanor while testifying.").

**25.** *Cf. McBride v. State*, 368 P.2d 925, 926 (Alaska 1962), *cert. denied*, 374 U.S. 811, 83 S.Ct. 1702, 10 L.Ed.2d 1035 (1963), *modified by Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) (" 'demeanor evidence' is acknowledged to be highly desirable and an advantage to be insisted upon whenever it can be

had and where an accused considers it important" (footnote omitted)).

**26.** Alaska R. Civ. P. 99. Notably, there is no provision whereby a juror may participate telephonically.

**27.** 929 P.2d 634, 642 (Alaska 1996), *cert. denied*, 520 U.S. 1198, 117 S.Ct. 1555, 137 L.Ed.2d 703 (1997).

**28.** 999 P.2d 786, 790 (Alaska 2000).

**29.** *Triem* is distinguishable because the objection there concerned the inability of one committee member participating by telephone in a second hearing to assess the demeanor of witnesses, not the party. The party had testified in person before the whole committee at an earlier hearing. Further, only one committee member participated by telephone. The other members heard the witnesses in person.

government's interest, how it is affected by the challenged procedure, and how it might be affected if the procedure were changed.[30] We turn to these questions.

The foremost government interest involved in driver's license revocation proceedings is public safety. Intoxicated drivers kill and injure others. One can reasonably conclude that revoking the licenses of those who refuse to take breath tests is an important part of the state's program to reduce instances of driving while intoxicated. The state also has an interest in providing hearings at a reasonable cost.[31]

Public safety will not be prejudiced by providing a person who is under threat of license revocation with an in-person hearing. Such hearings were the norm until the 1996 passage of AS 28.15.166(e). There is no suggestion in the legislative history of the 1996 act that its purpose was to increase the revocation rate of those accused of refusing breath tests. Indeed, if the revocation rate were increased by prohibiting in-person hearings, this would tend to prove that this reform increased the risk of the erroneous deprivation of driving rights.

Cost saving is at the root of the presumptive prohibition of in-person hearings. The length of a hearing conducted by telephone should not be significantly different than a hearing conducted in person. But if hearing officers are to travel to the DMV offices closest to where respondents reside, then travel costs and travel time for hearing officers will be greater for in-person hearings than for telephone hearings.

But greater costs are only incurred in cases in which the hearing officer must travel. In most cases no travel is necessary. Most revocations arise in Anchorage. DMV has a large number of employees in Anchorage and could require some hearing officers to maintain offices there. Similarly, in cases arising in Juneau there is no justification for

refusing an in-person hearing, since DMV hearing officers have offices there.

As to other locations without resident hearing officers, economies could be effected in other ways. Ad hoc hearing officers can be appointed. Or magistrates might be authorized to serve.[32] Alternatively, hearing officers can limit their travel to times when they have several cases for hearing. Further, respondents requesting an in-person hearing might be required to travel to a location served by a resident hearing officer, or to pay a share of the cost of the hearing officer's travel.

We do not minimize the legitimacy of cost savings as an objective of government. But given the circumstances and alternatives discussed above, we do not think that providing in-person hearings to parties who want them, in cases where their credibility is at issue, must be significantly more costly than the present system.

Considering then the importance of the driving privilege, the greater potential for effective communication in an in-person context, the need for effective communication where the credibility of a party is at issue, and the limited nature of the prejudice that the state would suffer by providing in-person hearings in such cases, we conclude that such hearings should be provided where requested by the party.

*Subsection .166(e) Should Be Construed So as to Avoid Unconstitutionality.*

Alaska Statute 28.15.166(e) requires telephone hearings "unless the hearing officer finds that a telephonic hearing would substantially prejudice the rights of the person involved in the hearing or that an in-person hearing is necessary to decide the issues to be presented in the hearing." This does not specify the circumstances under which a telephone hearing may substantially prejudice a defendant's rights or when an in-

---

**30.** 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**31.** *See Mathews v. Eldridge,* 424 U.S. at 348, 96 S.Ct. 893.

**32.** *See* AS 22.15.100(10) (granting district judges and magistrates authority "to review administrative revocation of a person's driver's license or nonresident privilege to drive ... when designated as a hearing officer by the commissioner of administration and with the consent of the administrative director of the court system.").

person hearing is necessary to decide the issues presented. "Where it is reasonable to do so, we will construe a statute to avoid constitutional problems."[33] In keeping with our conclusion that in-person hearings are required by due process in cases where the credibility of a party is in question, we construe subsection .166(e) to require in-person hearings where a party requests such a hearing and material questions depend on the credibility of the party's testimony.

In the present case, Whitesides made a timely request for an in-person hearing and objected when a telephone hearing was scheduled instead. This case involves material issues of his credibility. Therefore, an in-person hearing should have been held.

*Conclusion*

The decision of the superior court is REVERSED and this case is REMANDED to the superior court with instructions to VACATE the revocation of Whitesides's driver's license and to REMAND the case to the Division of Motor Vehicles for an in-person license revocation hearing.

EASTAUGH, Justice, concurring.

The result the court reaches here is correct, but I disagree with the court's analysis. In my view, Justice Carpeneti's dissent correctly reasons that a case-specific inquiry is required when deciding whether due process demands that a hearing in a driver's license revocation case be held in person. In comparison, the court's opinion may assume that every driver's license revocation inherently raises credibility issues and that it is not necessary to make a particularized request for an in-person hearing by identifying logically valid reasons why the hearing must be held live.

Even though I agree with Justice Carpeneti that the inquiry must be case-specific, I agree with the result reached by the court.

It is a close question whether Whitesides informed the hearing officer of circumstances that made it an abuse of discretion to deny his request. But on balance, Whitesides did enough. In his request for administrative

hearing, Whitesides, through counsel, asserted that "I did not refuse to take a breath test." In his objection to an administrative hearing, he stated, again through counsel, that "the failure to allow a hearing in-person would substantially prejudice the rights of licensee, in that he is a witness along with, if necessary, the arresting officer...." These assertions might have been more specific, but together they should have led the hearing officer to realize that Whitesides was denying that he had refused to be tested, and that he and the arresting officer would disagree about whether he had refused. This disagreement inherently raised a credibility issue that was critical to the limited issues relevant to his revocation proceeding. It was therefore an abuse of discretion to deny Whitesides an opportunity to present live testimony to the hearing officer.

I therefore concur in the result the court reaches although I respectfully disagree with its analysis.

CARPENETI, Justice, dissenting.

I dissent from today's ruling for two reasons. First, I disagree with the court's implied finding that Whitesides adequately raised before the hearing officer his claim that due process required an in-person hearing because credibility was a central issue. In fact, nowhere in the entire administrative record of this case is the word "credibility" found. What Whitesides did, in shotgun fashion, was raise several non-specific claims, to one of which this court has now, after the fact, attached a particular meaning that the record does not support. Second, and more important, the statute in question, properly applied by hearing officers of the Department of Public Safety whose decisions are reviewable by this court, protects the due process rights of drivers who face license revocation for refusal to submit to tests.

*Whitesides did not request an in-person hearing on grounds that credibility would be at issue.*

Whitesides first requested an in-person hearing in Ketchikan because of the number

---

**33.** *See Chenega Corp. v. Exxon Corp.,* 991 P.2d 769, 785 (Alaska 1999).

of witnesses involved: "[M]y client requests that his administrative hearing of his license revocation be held in person in Ketchikan. In other words, this hearing should be conducted by the Hearing Officer in Ketchikan. *This is due to the number of witnesses to be called.*" (Emphasis added.) Later, after the department scheduled a telephonic hearing, he filed an "Objection To Administrative Hearing (and Request for Telephonic [sic] Hearing)" in which he objected to the DMV's notice of telephonic hearing. He stated:

> The failure to allow a hearing in-person would substantially prejudice the rights of licensee, in that he is a witness along along [sic] with, if necessary, the arresting officer and potentially another witness (in rebuttal, Trevor Stephens, Asst. DA). *Because of the number of diverse witnesses,* any hearing should be in Ketchikan, not by telephone, and licensee requests the hearing in Ketchikan.

(Emphasis added.) In short, Whitesides's argument was that the number of witnesses required the hearing in Ketchikan, not that credibility was his concern. Finally, shortly before the hearing Whitesides filed "Additional Objections to Hearing." While he argued several ways [1] in which his due process rights would be violated by the upcoming hearing, he made no mention of the fact that it was to be telephonic or that credibility was an issue. In these circumstances, I cannot join the court's implied finding that Whitesides adequately raised credibility as the reason for requesting an in-person hearing.

*Alaska Statute 28.15.166(e) protects the due process rights of drivers faced with administrative revocation of their licenses for failure to submit to tests.*

The statute gives the hearing officer the power to require an in-person hearing if it is necessary to protect the rights of the driver or for other reasons:

The hearing under this section must be held by telephone unless the hearing officer finds that a telephonic hearing would substantially prejudice the rights of the person involved in the hearing or that an in-person hearing is necessary to decide the issues to be presented in the hearing.[2]

It seems clear that the legislature was concerned precisely about the issues addressed in today's opinion and set out the procedure by which those issues should be addressed. And in this case, the hearing officer considered the non-specific request for an in-person hearing, properly determined that it did not set out sufficient grounds, notified counsel for Whitesides of its deficiency, and specifically invited supplementation of the request for an in-person hearing:

> This letter is in reference to y[o]ur motion for an in person hearing for your client Frank Whitesides. The rescheduling of the hearing does not change the issues for review under AS 28.15.166(g). The statutes governing the issues rema[i]n the same and were in place at the time of your client's arrest. Your motion is denied.
>
> We do not believe that rescheduling a hearing to a telephonic hearing denies any participant their rights under due process. *Your motion did not establish any circumstances that would substantially prejudice the rights of the parties involved or that an in person hearing is necessary to decide the issues.*
>
> *If there are circumstances that we have not been advised of, you should present them at the hearing.* Please contact this office if you have any questions.

(Emphasis added.) Whitesides failed to respond to the letter or to advise the hearing officer at the hearing of those "circumstances that [the hearing officer had] not been advised of" that would lead her to reverse her decision not to provide an in-person hearing.

---

1. Whitesides argued that it was a violation of due process for DMV to act without regulations adopted by the commissioner; that "[r]evocation of a driver's license requires the full panoply of due process protections, including a jury trial"; that his conduct was "indisputably safe conduct: safely parked and braked, and safely warding off

hypothermia"; and that federal law makes clear that any revocation can be only temporary and that the delay in his case of more than six months was more than temporary.

2. AS 28.15.166(e).

The statute establishes the proper standard to protect the right of the driver to an in-person hearing.[3] Such a hearing will be afforded if a telephonic hearing substantially prejudices any party or if an in-person hearing is necessary to decide any issues.[4] In this case the hearing officer properly determined that "the number of witnesses" was not a sufficient reason to require an in-person hearing, that is, did not substantially prejudice the rights of the parties nor establish that an in-person hearing was necessary to decide the issues. But she went further and noted the standard for Whitesides and invited further information or argument on the issue. Under these circumstances, there is no reason to construe the statute further and no reason to provide relief to a litigant who neither raised the credibility issue originally nor when requested by the hearing officer to provide any further reason for the relief he sought.

Our jurisprudence makes clear the case-specific nature of the application of discretionary rules regarding telephonic versus in-person proceedings.[5] We ourselves have adopted a rule for telephonic proceedings that adopts the standard—absence of substantial prejudice—utilized by the legislature in AS 28.15.166(e):

> The court may allow one or more parties, counsel, witnesses or the judge to participate telephonically in any hearing or deposition for good cause and in the absence of substantial prejudice to opposing parties.[6]

Especially in rural areas of the state, trial courts not uncommonly allow telephonic proceedings where the judge is in one location, a witness in another, and the attorneys in another.

The court should review the department's action in light of the specific facts of each case under the standard that we have always utilized, abuse of discretion.[7] Because I believe that in this case the hearing officer did not abuse her discretion in declining to order an in-person hearing where the reason advanced was "the number of witnesses," and where no mention was made of assessing the credibility of the witnesses, I would find no abuse of discretion and affirm the superior court's affirmance of the hearing officer's action.

---

**3.** *See id.*

**4.** *See id.*

**5.** *Compare Gregg v. Gregg,* 776 P.2d 1041, 1044 (Alaska 1989) (trial court did not abuse discretion in allowing telephonic testimony of material witness over objection) *with Silvers v. Silvers,* 999 P.2d 786, 790 (Alaska 2000) (trial court abused discretion in precluding party from testifying telephonically).

**6.** Alaska R. Civ. Proc. 99.

**7.** *See Silvers,* 999 P.2d at 790; *Carvalho v. Carvalho,* 838 P.2d 259, 262 (Alaska 1992).