NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| AMIRA N., | ) |
| | ) Supreme Court No. S-18085 |
| Appellant, | ) |
| | ) Superior Court No. 3PA-19-00055 CN |
| v. | ) |
| | ) MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No. 1882 – March 9, 2022 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, John C. Cagle, Judge.

Appearances: Michael Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, for Appellant. David A. Wilkinson, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I.  INTRODUCTION

Trial on a petition to terminate a mother's parental rights was held telephonically due to administrative orders providing for telephonic trials to mitigate the effects of the COVID-19 pandemic. These orders permitted litigants to request an in-

---

\* Entered under Alaska Appellate Rule 214.

person appearance, but the mother, who was incarcerated at the time of trial, did not make this request. On appeal she argues that the telephonic trial violated her due process rights because telephonic participation hampered her ability to control her outbursts, confer with counsel, and access exhibits and because the prison setting made it emotionally and psychologically difficult to testify. Because the mother's claim that telephonic participation prejudiced the outcome of her trial is purely theoretical, we conclude there was no due process violation and affirm the superior court's judgment.

## II.    FACTS AND PROCEEDINGS

### A.    Rylie's Early Life

Rylie was born in October 2017 to Amira.[1] Amira used cocaine for the first months of her pregnancy. She was also a "pretty hard core" methamphetamine user before Rylie was born. Amira flew to Washington to give birth due to domestic violence with Rylie's father. Rylie's umbilical cord tested positive for cocaine and cannabis.

Amira returned to Alaska with Rylie in October 2018. They moved into a woman's home where Amira provided in-home care. Amira later described the woman as a "major drug addict and a major alcoholic." Amira eventually left the house to stay with a friend after an episode in which she called 911 and claimed to have been held hostage. After being informed by OCS that the new home was "not a fit placement" for Rylie, Amira left her daughter with an acquaintance while Amira "chose to be homeless," sleeping outside.

In May 2019 Rylie's caretaker informed OCS that she could not care for Rylie because she was receiving threatening messages from Amira. In one of the messages Amira threatened the caretaker with "slaughter time" if she relinquished Rylie to OCS. OCS took emergency custody of Rylie that same day; Rylie's hair tested

---

[1]    We use pseudonyms to protect the parties' privacy.

positive for marijuana, amphetamine, and methamphetamine, while Amira's hair tested positive for amphetamine and methamphetamine. Amira attributed the positive tests to secondhand ingestion, claiming that her former roommate had been putting methamphetamine in their milk.

## B.    OCS Involvement

The following day OCS filed an emergency petition to adjudicate Rylie a child in need of aid due to abandonment, risk of physical harm, neglect, parental substance abuse, and parental mental illness.[2] At an emergency probable cause hearing, the court made provisional findings that Rylie was a child in need of aid due to "unstable, unsafe living conditions" and exposure to methamphetamine and potentially weapons.

In June OCS developed a case plan for Amira. The goals of the plan were for Amira to live free of drugs, alcohol, and violence; to care for her mental and emotional health; and to learn more about child development to better meet Rylie's needs. The plan required weekly urinalysis, a substance abuse assessment, abstinence from drugs and alcohol, attendance at Alcoholics Anonymous and Narcotics Anonymous, a psychological assessment, domestic violence classes or groups, parenting classes, and "consistent and appropriate" contact with Rylie.

Amira largely rejected these services. OCS referred her for a substance abuse assessment but "was met with constant refusals to engage in this service." Amira responded similarly to OCS's referrals to a domestic violence program, although she enrolled in an unaccredited online program that OCS determined was not appropriate to meet the requirements of her case plan. Amira "was not willing to engage" in the psychological evaluation when OCS referred her in fall 2019. She missed every

---

[2]    AS 47.10.011(1) (abandonment), (6) (risk of physical harm), (9) (neglect), (10) (parental substance abuse), (11) (parental mental illness).

urinalysis appointment despite being informed that missed tests would be considered positives.

Amira did attend visitation with Rylie, including while she was incarcerated, although several visits were ended early because of Amira's behavior. Amira sometimes "interrogated" Rylie "about where she was at or who was hurting her," interpreting Rylie's behaviors as the result of abuse. Amira inconsistently engaged in telephonic visitation during the COVID-19 pandemic.

Amira also acted aggressively toward OCS staff and caregivers. In May 2019 Amira was so verbally disruptive and out of control during visitation that OCS called law enforcement. That summer Amira "accosted the foster family outside of the OCS office" and posted photos of the family's vehicle on social media while "accus[ing] the foster family of . . . kidnapping her child and ask[ing] for the community's assistance in locating" them.

In June 2019, after a visit with Rylie at an OCS office, Amira went to the back of the building and slammed a rock on the windows while screaming that OCS had her daughter, eventually breaking one window. OCS employees inside were frightened and called the police; Amira was trespassed from the building. Amira was no longer allowed to come to OCS for visitation, and other service providers refused to work with her because they were familiar with her violent behavior.

In August 2019 Amira was arrested for threatening to kill her OCS caseworker. She was charged with second-degree terroristic threatening, third-degree assault, second-degree harassment, and resisting arrest. Amira allegedly called the caseworker and told him "she ha[d] a group of her people together and she [was] coming with them to OCS [the next day] . . . [to] kill him," having "stated numerous times" that she owned a gun and "is not afraid to use it and will kill [the caseworker]." This caseworker had to stop working with Amira because he faced a conflict of interest as a

potential victim in Amira's criminal case; another OCS worker volunteered as a replacement because he was one of the few employees in the office without children or other family at home. Charges of third- and fifth-degree criminal mischief were added to Amira's existing charges based on the damage she caused to OCS's office.

In March 2020 OCS evaluated Amira's case plan and concluded that she had made no progress on her goals. OCS recommended Rylie's continued out-of-home placement:

> [Amira] has been combative, threatening, and violent. She refuses to participate in her case plan activities or work with the department. [Amira] uses social media to attempt to locate her child's placement, as well as make false accusations to garner support from the community and make herself appear to be a victim of the department. Due to [Amira]'s behaviors and refusal to participate, the department is unable to appropriately assess [Amira]'s circumstances and cannot safely place the child back in her home.

## C.    Termination Petition

In April 2020 OCS petitioned for termination of Amira's parental rights. At a hearing the following month, Amira continually interrupted the proceedings, eventually forcing the court to mute her telephone.

Amira moved to continue the trial then scheduled for July 2020, arguing that social distancing measures required by the COVID-19 pandemic raised due process concerns. Specifically, Amira argued that telephonic appearances gave her "no real ability to confer with counsel during the trial." She also argued that appearing in person was not satisfactory, as sitting six feet apart "destroy[s] any ability to confer privately" and Amira's counsel was uncomfortable having closer physical contact. OCS opposed, suggesting that Amira and her counsel use text or email communication, take frequent breaks, or sit in a large conference room by themselves where they could maintain

distance but still communicate freely. The court granted the continuance until August 26. Amira again moved to continue the trial in early August on largely the same grounds; the court moved the trial to early November.

At a September 2020 hearing, Amira invited supporters to call in to a hearing and repeatedly interrupted the proceedings, prompting the court to warn Amira that it would mute her. Amira posted case documents on social media and was instructed by the court not to do so. A hearing was also "streamed on Facebook Live to a worldwide audience by an individual known to [Amira]," despite the court's warnings about confidentiality.

Amira's attorney sought to withdraw at multiple hearings so that Amira could represent herself, explaining that Amira had "stated many, many, many times that she want[ed] to fire" the attorney and communication had become "impossible." The judge denied the motion for self-representation at a November 2020 hearing, in part due to Amira's "inability to stop interrupting, to fail to adhere to the orders of the court." For example, at this hearing Amira had argued extensively with the judge:

> THE COURT: Is there someone else on the line that I have not identified?
>
> AMIRA: Nope, there's not. Yes, it is being recorded.
>
> THE COURT: Which is also against the rules. [Amira], first of all, you – I'm struggling in that you can't follow courts' orders. Again, I would let you --
>
> AMIRA: I'm struggling with the --
>
> THE COURT: -- represent yourself --
>
> AMIRA: -- fact that my child has been --
>
> THE COURT: -- and I would be happy to --
>
> AMIRA: -- completely taken away from me without judicial order. Where is [Rylie] and why is she completely erased

from my life?  Answer some questions for me, Your Honor, I'd appreciate that.

THE COURT: [Amira] --

AMIRA: Without a judicial order.

THE COURT: -- [Amira] --

AMIRA: You have a million people right now listening to you, Judge . . .  I would make a really good argument.

THE COURT: [Amira], this -- I've already ordered the hearing closed.  This hearing is confidential.

AMIRA: Done.

THE COURT: I want to warn you that breaking the --

AMIRA: I want to warn you --

THE COURT: -- confidentiality that is --

AMIRA: -- that this court is also in sanction.

THE COURT: -- it's also --

AMIRA: Don't threaten me.

THE COURT: -- it's also illegal.  It could be a misdemeanor.

AMIRA: What you're doing is illegal.  The removal and the absolute, 100 percent concealment of my child is illegal.  Continue on.

THE COURT: Therefore --

AMIRA: Therefore you should go to jail?

At this same hearing the court continued the trial at Amira's request until March 2021.

In December 2020 Amira posted threats against OCS workers on Facebook, leading probation officers to visit her residence.  Amira barricaded herself in a bathroom next door and threatened to kill herself; she yelled that she was going to kill the officers and medical staff who showed up to transport her to the hospital, where she also fought

with medical staff. Amira was charged with violating conditions of release and later admitted that she used methamphetamine that day after being denied visitation with Rylie. The officers who searched her residence found items "indicative of methamphetamine and/or heroin use."

### D. Termination Trial And Appeal

The court held a termination trial over two days in March 2021, while Amira was incarcerated at Hiland Mountain Correctional Center. At that time trials were governed by a court system administrative order that required all parties in a civil case to appear by telephone or videoconference unless the court granted a timely request for an in-person appearance upon a showing of good cause.[3] There is no indication in the record that Amira moved to appear in-person as provided in the administrative order. All trial participants attended telephonically.

At the outset Amira stated: "My constitutional rights state the fact that I'm allowed to see my accusers, and I don't think that what you're doing right now is legal at all." At Amira's request the court permitted her to speak with her attorney following opening statements. Afterwards Amira's attorney made no objection and indicated the trial could go forward.

The court made adjustments to the trial process to account for the parties' telephonic participation and the emotional nature of the proceedings. The court granted Amira's attorney's request for breaks before cross-examination to confer with Amira, permitting them "five, 10 minutes, however long [they] need[ed]." The court followed this procedure — noting "the specific order from the Supreme Court . . . that [judges] allow time for attorney-client communication during the hearings" — allowing Amira

---

[3]     Third Presiding Judges' Statewide COVID-19 Pandemic Administrative Order (May 29, 2020).

to confer with her attorney regularly. Amira set up a meeting with her attorney between trial days, and the court granted them time to speak before the second day of trial. When Amira became emotional and chose to "set the phone down for a second," the court paused and stated, "Let's give her a moment." The court also told Amira: "I know it's been emotional for you. If you need breaks, just let me know and we'll take a break if you need time to get your composure, okay?"

The court heard testimony from Amira's OCS caseworker, who testified that Amira had failed to follow her case plan and was "out of control"; an OCS worker who described Amira's property damage at the Wasilla office; law enforcement officers; and a social worker who offered an expert opinion that Amira failed to address her behaviors, leading to unsafe situations and incarceration and affecting her contact with Rylie.

After trial the court terminated Amira's parental rights. It found that Rylie was a child in need of aid based on Amira's substance abuse, neglect, and substantial risk of physical harm. It found that OCS had made reasonable efforts, that Amira had not remedied her conduct after nearly two years, and that termination was in Rylie's best interests. The court explained that Amira "would need to show lengthy sustained sobriety and stabilized mental health in order to successfully reunite" and that the likelihood of reunification was "slim" without Amira's engagement in her case plan.[4]

Amira appeals.

---

[4] The court separately terminated the parental rights of Rylie's father following an August 2020 trial. He did not appeal that order and is not participating in this appeal.

## III. DISCUSSION

### A. Amira Did Not Ask The Trial Court To Hold In-Person Or Video Proceedings, So We Review Her Argument That Telephonic Proceedings Violated Her Due Process Rights For Plain Error.

Amira's sole argument on appeal is that the telephonic trial violated her due process rights. She maintains that the telephonic format of the proceeding prejudiced her because it "adversely impacted [her] ability to communicate with counsel, take part in the proceedings (e.g., see exhibits), and to comport herself to courtroom decorum."

At the outset we observe that the Child in Need of Aid (CINA) Rules expressly permit telephonic participation.[5] The CINA Rules themselves do not place any limits on telephonic testimony, but we have recognized that the right to due process may require in-person participation by parties or witnesses in some circumstances, such as when a party's credibility is relevant.[6] To decide whether due process required in-

---

[5]    CINA Rule 3(g); *see also Aaron B. v. State Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-17116, 2019 WL 3216006, at *5 (Alaska July 17, 2019) ("Telephonic testimony by parties and witnesses is common practice in CINA proceedings . . . .").

[6]    *See, e.g.*, *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1138 (Alaska 2001) (holding that where the credibility of an individual in a driver's license revocation hearing was at issue, due process requirds that individual be permitted to testify in person). *But see, e.g.*, *Alex H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 389 P.3d 35, 42-46 (Alaska 2017) (holding court did not violate due process rights of incarcerated parent when it denied transport to appear in person); *Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 71 P.3d 811, 831-33 (Alaska 2003) (holding court did not violate due process rights of incarcerated parent when it denied transport request because parent's credibility was immaterial). The Washington Court of Appeals has also held that a parent's telephonic testimony during a termination hearing did not violate due process. *In re J.D.E.C.*, 491 P.3d 224, 226-29 (Wash. App. 2021) (holding no due process violation when parent appeared telephonically at trial held by videoconference when parent made no request

(continued...)

person appearance, we apply the balancing test articulated in *Mathews v. Eldridge*.[7] The *Mathews* test requires us to balance: (1) the private interest affected by state action; (2) the risk that this interest will be erroneously deprived under the procedures used and the probable value, if any, of additional procedural safeguards; and (3) the government's interest, including the budgetary and administrative burden that the additional procedures would entail.[8] We review constitutional questions such as these de novo and "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[9]

In this case two other factors come into play. First, Amira's trial was held telephonically pursuant to court administrative orders adopted to reduce the spread of COVID-19. These orders created a default rule of telephonic proceedings but expressly permitted litigants to request to appear in person.[10] Second, Amira was incarcerated at the time of the trial but could have requested that the court order her in-person appearance.[11]

---

[6]     (...continued)
for in-person appearance and was not able to appear by video).

[7]     *Seth D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1222, 1227 (Alaska 2008) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976)).

[8]     *Mathews*, 424 U.S. at 334-35.

[9]     *Dennis O. v. Stephanie O.*, 393 P.3d 401, 405-06 (Alaska 2017) (quoting *Jerry B. v. Sally B.*, 377 P.3d 916, 924-25 (Alaska 2016)).

[10]     Third Presiding Judges' Statewide COVID-19 Pandemic Administrative Order (May 29, 2020); Alaska Supreme Court Order No. 1957 (March 19, 2020) (permitting presiding judge to issue orders requiring telephonic or video appearances).

[11]     AS 33.30.081(f) (permitting court to order an incarcerated person's transportation to a civil hearing after court has considered alternative methods of
(continued...)

Yet Amira did not avail herself of these options, nor did she object to proceeding telephonically. Although she interjected during opening argument that not being able to see her "accusers" was unconstitutional, after Amira consulted with her counsel, her counsel advised the trial court to proceed.[12] The record does not show that Amira ever requested in-person participation under either the COVID-19 administrative orders or the prisoner transport statute. And she did not request that proceedings be conducted by videoconference. Because she did not request relief from the trial court, we review her arguments that telephonic participation violated her due process rights for plain error.[13]

The limited scope of our review is especially pertinent to Amira's contention that the court should have conducted the trial by videoconference. Amira argues that "Zoom was not only feasible but . . . commonplace" at the time. Yet because she did not ask the superior court to hold proceedings by video, we do not know how feasible doing so from prison was at the time, nor do we know whether the superior court may have had valid reasons to disallow it — such as Amira's tendency to inappropriately record confidential proceedings.

---

[11]     (...continued)
appearance including telephonic testimony).

[12]     Amira, represented by counsel, was not permitted to lodge her own objections. *See* Alaska R. Civ. P. 81(c)(2) ("Except as otherwise ordered by the court . . . a party who has appeared by an attorney may not thereafter appear or act in the party's own behalf in any action or proceeding . . . .").

[13]     *D.J. v. P.C.*, 36 P.3d 663, 667-68 (Alaska 2001) ("Issues not raised in the trial court shall not be considered on appeal, except for plain error. Plain error exists 'where an obvious mistake has been made which creates a high likelihood that injustice has resulted.' " (quoting *Sosa v. State*, 4 P.3d 951, 953 (Alaska 2000))).

**B. Amira's Telephonic Attendance At The Termination Trial Did Not Violate Due Process.**

**1. Amira had a significant interest in retaining her parental rights.**

The parties agree that Amira's interest in retaining her parental rights is significant. We have "characterized this right as 'one of the most basic of all civil liberties,' and recognize that it clearly falls within the protections of the due process clause and should be accorded significant weight."[14] Amira's interest is indisputably strong.

**2. Amira fails to show more than a theoretical risk of prejudice resulting from the telephonic trial.**

The second prong of the *Mathews* test requires us to consider whether alternate procedures — attending trial in person or via videoconference — would meaningfully reduce the risk of erroneous deprivation of Amira's rights.[15] Although the due process analysis is a "flexible and contextual one focusing on the interest and not the outcome," a litigant claiming a due process violation must show "some actual prejudice . . . and not merely the 'theoretical possibility of prejudice.'"[16] Amira argues four ways that holding her trial telephonically risked erroneous deprivation of her rights.

First, Amira maintains that being forced to participate telephonically rendered her "absolutely unable to comport herself in a manner conducive to a fair and objective consideration of the questions involved in determining her parental rights."

---

[14] *Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 71 P.3d 811, 831 (Alaska 2003) (quoting *Flores v. Flores*, 598 P.2d 893, 895 (Alaska 1979)).

[15] *See Paula E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 276 P.3d 422, 433-35 (Alaska 2012).

[16] *Id.* (quoting *D.M. v. State, Div. of Fam. & Youth Servs.*, 995 P.2d 205, 212 (Alaska 2000)).

She argues that "without the direct moderation of her trial counsel," Amira talked over other participants nonstop, demonstrated an "inability to control herself" and used derogatory language that ultimately led the court to mute her numerous times. Had she appeared for her trial in person, Amira seems to imply, she may have acted in a way that would have made a better impression on the trial judge.

Yet there is scant reason to think Amira would have behaved better, or made a better impression, at an in-person or videoconference trial. For example, in an August 2019 in-person hearing, Amira interrupted the judge so regularly that the judge admonished: "I'm holding a gavel in my hand, I've never used it in the court. And [Amira] is the only person that has ever made me actually reach for it." As OCS points out, Amira's telephonic participation may actually have "facilitated more decorous participation." When Amira continued to interrupt a witness, the judge explained he would mute her but that Amira would have the opportunity to speak with her attorney before cross-examination and advised, "[M]ake sure you're taking notes . . . [W]e'll have that break . . . and you'll be able to go through all of this with [your attorney]." It is difficult to imagine how holding Amira's termination trial by videoconference or in person would have changed her courtroom behavior or the judge's impression of it.

Second, Amira argues she was "unable to communicate in real time or sufficiently with her trial counsel," which caused her "frustration and limited her ability to express the need for certain objections or to direct particular questions." In other words, Amira believes that had she attended the trial in person, she could have preserved objections or strengthened her attorney's examination of witnesses. In *Alex H.* we rejected an argument that a parent's telephonic participation resulted in a due process violation when the parent's attorney was present and effectively cross-examined witnesses, the parent could hear proceedings well enough to respond to questions, and

the parent and counsel consulted privately throughout the trial.[17] This case is similar, as the judge afforded Amira and her counsel regular opportunities to talk privately during trial. And there is little reason to think that giving Amira more opportunity to interrupt witnesses or prompt her attorney to object would have resulted in a more effective trial presentation. The examples Amira cites involve her attempting to object to testimony she claims is false, which is not a valid basis for objection. Amira does not convincingly explain how her own telephonic appearance prejudiced her counsel's ability to effectively object to testimony or cross-examine witnesses.

Third, Amira claims she did not have access to discovery while at Hiland and could not review exhibits during the trial, even when asked questions about them. The superior court had ordered Amira's attorney to produce redacted discovery to Amira on or before October 1, 2020. Amira mentioned that she did not have exhibits with her during the trial. The record does not indicate why Amira did not have these exhibits. But in the specific instance Amira cites, the exhibit was read aloud to Amira to refresh her memory. The guardian ad litem read to Amira a section of her behavioral health assessment about methamphetamine use to establish that it accurately reflected Amira's history with the drug, which she confirmed. Amira fails to explain how not having this exhibit on hand prejudiced her. Had the guardian ad litem incorrectly quoted the exhibit, Amira's counsel could have pointed out the error. And Amira and her attorney conferred shortly after the exchange, giving Amira's counsel the opportunity to bring up any salient counterpoints on redirect. Amira's claim of prejudice is purely theoretical.[18]

---

[17]     *Alex H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 389 P.3d 35, 44-46 (Alaska 2017); *see also E.J.S. v. State, Dep't of Health & Soc. Servs.*, 754 P.2d 749, 752 (Alaska 1988) (concluding the same).

[18]     *Paula E.*, 276 P.3d at 433 (requiring "some actual prejudice" and "not
(continued...)

Fourth, Amira contends she was "simply not afforded a reasonable setting to occupy for trial." She explains she was forced to use a prison telephone "in a small, claustrophobic room" that she later described as a "four by four plastic box in the middle of Hiland." As a result, Amira claims she was emotionally vulnerable and unprepared to assist in her defense. The physical setting described by Amira is not ideal. Yet there is no reason to think that holding trial by video would have ameliorated whatever effects her physical surroundings may have had. More significantly, Amira fails to articulate a concrete connection between the physical environment in which she attended the trial and the risk of erroneous findings. The claim of prejudice is, again, entirely theoretical.

### 3. The State had a significant interest in proceeding telephonically to reduce the risk of spreading COVID-19 and to avoid further delay of the child's permanency.

The third prong of the *Mathews* test requires us to consider the state interest implicated by the alternative procedures proposed. In this case, that means considering the burdens of holding the trial in-person on that date or delaying the trial until a later date to allow in-person participation. Amira describes the State's interest in holding a telephonic trial on the scheduled date as merely avoiding "administrative burdens." OCS argues that its interests were more significant: "timely moving forward with the termination trial to secure permanency for Rylie, while at the same time managing the proceedings in a manner that did not risk participants' health and mitigated the spread of COVID-19." We agree with OCS's characterization of the state interests at stake.

The legislature has found that children "undergo a critical attachment process" before the age of six and that it is therefore "important to provide for an

---

**18** (...continued)
merely the 'theoretical possibility of prejudice' " (quoting *D.M.*, 995 P.2d at 212)).

expited placement procedure" in CINA cases.[19]  For that reason children should be "placed in permanent homes expeditiously."[20]  "[B]ecause permanency is . . . in the child's best interests, the unnecessary 'lengthening of judicial procedures' may . . . run counter to the child's best interests."[21]

Rylie is only four years old and has spent over half of her life in OCS custody.  OCS filed its termination petition in April 2020, yet trial was not held until March 2021 because the court granted Amira several continuances.  Delaying the trial again, as Amira argues the superior court should have done, would have further run counter to Rylie's need for permanency.

Amira does not challenge the State's interest in Rylie's permanency as a general matter.  Instead, Amira argues that the State's interest in holding trial in March 2021 was negligible because the court could have "simply wait[ed] a few weeks" to hold an in-person trial.  She points to administrative orders issued in March and April that permitted resumption of some in-person trials.[22]  But those orders pertained to criminal trials, not civil trials, which as OCS points out still required remote appearances unless a party requested otherwise until June 2021.[23]  And even then, judges were instructed to

---

[19]     AS 47.05.065(5).

[20]     *Id.*

[21]     *Sarah A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 427 P.3d 771, 783 (Alaska 2018) (quoting *Dennis O. v. Stephanie O.*, 393 P.3d 401, 411 (Alaska 2017)).

[22]     Special Orders of the Chief Justice Nos. 8242 (March 1, 2021), 8259 (April 6, 2021) (concerning criminal trials).

[23]     Third Presiding Judges' Statewide COVID-19 Pandemic Administrative Order (May 29, 2020) (requiring remote participation absent a timely request to appear (continued...)

"continue to liberally allow remote participation in regions with high average daily case rates."[24] Amira's argument is based on hindsight. But on the eve of trial in March 2021, the superior court could not know how long it would be until in-person civil trials resumed. What the superior court did know was that Rylie had already waited a long time for permanency.

Nor does Amira challenge the general state interest in preventing the spread of COVID-19. The court system modified trial and hearing procedures "[d]ue to the transmissibility of COVID-19 and symptoms of the respiratory disease," seeking to "ensure the safety of court personnel, litigants, and the public during this public health emergency."[25] These modifications included relaxing rules allowing telephonic and videoconference appearances in an attempt to reduce COVID-19 transmission by limiting face-to-face contact.[26] The orders expressly permitted litigants to request to appear in person,[27] which Amira did not do. Amira does not ultimately challenge the underlying justification for remote trials during this time frame.

In sum, OCS's interests in not delaying the trial any further and the general state interest in holding the trial telephonically to prevent the spread of COVID-19 are entitled to substantial weight.

---

[23]    (...continued) in person after showing cause); Special Order of the Chief Justice No. 8280 (June 7, 2021) (permitting courts to allow or require in-person appearances).

[24]    Special Order of the Chief Justice No. 8280 (June 7, 2021).

[25]    Alaska Supreme Court Order No. 1957 (March 19, 2020).

[26]    *Id.*; Third Presiding Judges' Statewide COVID-19 Pandemic Administrative Order (May 29, 2020).

[27]    Alaska Supreme Court Order No. 1957 (March 19, 2020); Third Presiding Judges' Statewide COVID-19 Pandemic Administrative Order (May 29, 2020).

### 4. Weighing the factors

Although Amira has a significant interest in her parental rights, Amira fails to show that being allowed to appear at trial in person or by videoconference would have meaningfully lessened the risk of an erroneous deprivation of her parental rights. And the reasons for holding trial with remote participation — to protect against the spread of COVID-19 and to prevent further delay of permanency for Rylie — are weighty. Although Amira claims appearing by videoconference would have been easy, she never requested to appear by video, so there is no record that would allow us to determine how feasible it would have been for Amira to appear by video from prison and whether there may have been considerations weighing against video appearance. On balance, Amira fails to show an obvious mistake creating a high likelihood of injustice.[28]

## IV. CONCLUSION

We AFFIRM the judgment of the superior court.

---

[28] *See D.J. v. P.C.*, 36 P.3d 663, 668 (Alaska 2001) ("Plain error exists 'where an obvious mistake has been made which creates a high likelihood that injustice has resulted.' " (quoting *Sosa v. State*, 4 P.3d 951, 953 (Alaska 2000))).